**CROZER CHESTER MEDICAL CENTER and Phico Insurance Company, Petitioners,**

v.

**MEDICAL PROFESSIONAL LIABILITY CATASTROPHE LOSS FUND; and John H. Reed, Director of the Medical Professional Liability Catastrophe Loss Fund, Respondents.**

Commonwealth Court of Pennsylvania.

Argued May 5, 1998.

Decided June 25, 1998.

Robert R. Reeder, Philadelphia, for petitioners.

Guy A. Donatelli, West Chester, for respondents.

Before FRIEDMAN and FLAHERTY, JJ., and McCLOSKEY, Senior Judge.

FRIEDMAN, Judge.

Petitioners, Crozer Chester Medical Center (CCMC) and Phico Insurance Company (Phico), and Respondents, the Medical Pro-

fessional Liability Catastrophe Loss Fund (CAT Fund or Fund) and its Director, John H. Reed (Director), have filed cross-motions for judgment on the pleadings which were consolidated by this court for consideration in our original jurisdiction. Central to this case is the proper interpretation to be accorded section 702 of the Health Care Services Malpractice Act (Act),[1] the key to determining the entity responsible for the defense of professional liability claims made against qualified health care providers.

The pleadings establish the following undisputed facts. CCMC is a health care provider within the meaning of section 103 of the Act, 40 P.S. § 1301.103, and Phico is CCMC's basic coverage insurance carrier. *See* section 701(a)(1) of the Act, 40 P.S. § 1301.701(a)(1). Phico's basic coverage insurance policy obligated Phico to defend CCMC only with respect to professional liability claims payable under the policy. The CAT Fund is a Commonwealth agency created by the Act as a contingency fund to provide insurance coverage for health care providers beyond the provider's basic coverage insurance;[2] the Fund is administered by the Director. Sections 701(d) and 702(a) of the Act, 40 P.S. § § 1301.701(d) and 1301.702(a).

On February 11, 1992, the CAT Fund issued Bulletin 59, indicating that the CAT Fund should provide both defense and indemnification for health care providers when the providers exhaust their basic coverage or self-insured limits.[3] By letter dated September 19, 1994, as directed by Bulletin 59, Phico informed the CAT Fund that payments of medical malpractice claims on behalf of CCMC exceeded one half of the annual aggregate limit of liability under the Phico basic coverage insurance policy for the year July 1, 1991 through July 1, 1992. On December 19, 1994, Phico sent another letter informing the CAT Fund that CCMC had now exceeded payment of 75% of its policy limit for 1991–1992, and Phico requested that the CAT Fund "undertake the handling of the 13 remaining cases in concert with Phico until such time when the aggregate has been exhausted. At that point, we request you defend and indemnify the remaining open cases to the extent of the limit of your liability." (Petitioners' Petition for Review, Exhibit C.) Phico's request that the CAT Fund take over the defense of post-exhaustion claims fully comported with the CAT Fund's policy at the time, as reflected in Bulletin 59.

However, on January 18, 1995, only one month after Phico's request, the CAT Fund revoked Bulletin 59 as contrary to the Act and issued Bulletin 74 to supersede the CAT Fund's prior policy statement. Bulletin 74 provided that, after further review, the Director determined that the Act does not permit the Fund to pay for the costs of defense in situations where the health care provider's

---

1. Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. § 1301.702.

2. In 1975, the Pennsylvania General Assembly approved the Act and created the CAT Fund to pay, up to the Fund's limit of liability, any awards, judgments and settlements which medical liability claimants obtained from health care providers when the awards exceeded the "basic coverage insurance" which eligible health care providers are required to have. Section 701(d) of the Act, 40 P.S. § 1301.701(d). A primary purpose in establishing the CAT Fund was to assure the availability of reasonably priced professional liability insurance for all Pennsylvania health care providers and to ensure that persons injured as a result of medical malpractice may obtain prompt adjudication of their claims and receive reasonable compensation for those claims. Section 102 of the Act, 40 P.S. § 1301.102.

3. In relevant part, Bulletin 59 provides:

The Fund has received a number of inquiries requesting clarification on whether the Fund will "drop down" and provide defense and indemnification to health care providers ... which exhaust the annual aggregate of basic coverage or self-insured limits, through indemnification payments.

After a careful review of all applicable statutes, regulations and previous unofficial statements, the Fund has concluded that with certain exceptions, it is in the best interest of the health care community to provide defense and indemnity until such time as the remaining and available annual Fund aggregate coverage is expended.

Basic coverage insurers or self-insured entities shall advise the Fund as soon as indemnity payments meet or exceed one half (1/2) of the annual basic coverage aggregate limits....

(Petitioners' Petition for Review, Exhibit B.)

basic coverage insurance has been exhausted.[4]

On February 1, 1995, CCMC exhausted, by payments of judgments or settlements, its annual aggregate limit of liability under the Phico policy, thereby absolving Phico of any contractual obligation to further defend CCMC for the post-exhaustion claims. Thereafter, by letter dated February 3, 1995, the CAT Fund officially notified CCMC and Phico that the CAT Fund would indemnify CCMC for post-exhaustion claims; however, the CAT Fund also stated that "the Fund's indemnification does not include costs of defense. Accordingly, we would anticipate Phico's continued provision of all costs of defense." (Petitioners' Petition for Review, Exhibit F.) In response to the CAT Fund's continued refusal to defend CCMC against professional liability claims within the CAT Fund's indemnification obligation, (*see* Petitioners' Petition for Review, Exhibits G and H), Petitioners filed a three-count Petition for Review.

■ Count I of the Petition for Review is in the nature of a petition for writ of mandamus, wherein Petitioners request this court to command the CAT Fund to assume and pay for the defense of all professional liability claims against CCMC, subsequent to the exhaustion of CCMC's basic coverage insurance, until such time as the Fund's limit of liability has been paid for the policy year July 1, 1991 through July 1, 1992. In the alternative, in Count II of the Petition for Review, Petitioners seek a declaratory judgment that the CAT Fund is obligated to defend CCMC against all professional liability claims, and to pay for the defense of such claims, subsequent to the exhaustion of CCMC's basic coverage insurance, until such time as the Fund's limit of liability has been paid for the policy year July 1, 1991 through July 1, 1992. Finally, in Count III of the Petition for Review, Petitioners seek restitution, requesting that this court order the CAT Fund to reimburse Petitioners for all sums expended in defense of CCMC, subsequent to the exhaustion of CCMC's basic coverage insurance, until such time as the Fund's limit of liability has been paid for the policy year July 1, 1991 through July 1, 1992. Respondents filed an Answer to the Petition for Review, along with New Matter, and, *inter alia*, denied that the CAT Fund has the obligation to provide defense costs for any professional liability claims against CCMC, including post-exhaustion claims. Petitioners filed a Response to Respondents' New Matter, and Petitioners and Respondents then filed the cross-motions for judgment on the pleadings currently before this court.[5]

■ Relying on the Act, Petitioners contend that, after a health care provider's basic

---

4. In relevant part, Bulletin 74 provides:

> The Director has further reviewed Fund Bulletin 59 in the context of the ... Act. To that end, the Director believes that the statute does not permit the Fund to pay for the costs of defense in situations where the health care provider's statutory primary limit have [sic] been exhausted. Instead, section 702 of the Act states that:
> The basic coverage insurance carrier or self-insured provider *shall* be responsible to provide a defense in the claim, including defense of the Fund, except as provided for in section 605 (Emphasis added).
> 40 P.S. § 1301.702(d). Accordingly, the clear language of the ... Act, regarding responsibility for the defense of claims, with the specific exception for cases brought under section 605, renders Bulletin 59 in conflict with the Act. The Director believes that the Fund's previous pronouncement was made in reliance on section 702(f) of the Act, which empowers the Director with broad discretion in terms of defending, litigating, settling or compromising

> any claim payable by the Fund. ... The broad grant of discretion granted to the Director in the Act mandates a change in policy. The Director believes utilization of this discretion in the manner suggested herein, with applicability to all professional liability carriers, will promote fairness among carriers, and will ensure the financial integrity of the Fund....
> (Petitioners' Petition for Review, Exhibit D.)

5. A ruling on a motion for judgment on the pleadings in this court's original jurisdiction is in the nature of a demurrer, so that all of the opposing parties' allegations of fact are viewed as true, and only allegations specifically admitted may be considered against that party. *Pennsylvania Association of Township Supervisors v. Department of General Services*, 666 A.2d 1153 (Pa. Cmwlth.1995), *aff'd*, 547 Pa. 160, 689 A.2d 224 (1997). Moreover, a motion for judgment on the pleadings in this court's original jurisdiction will summarily dispose of a case only where there exists no genuine issue of material fact and the moving party clearly is entitled to judgment as a matter of law. *Id.*

coverage insurance carrier exhausts its annual aggregate limit of liability, the CAT Fund must assume the defense of qualified providers against any remaining claims payable by the Fund. However, Respondents counter that, under the clear dictates of the Act, the basic coverage insurer's responsibility to defend against professional liability claims continues even after the exhaustion of the basic coverage policy limits and the termination of the basic coverage carrier's contractual defense obligations to the health care provider. Based on the language of the Act, we must agree with Respondents that the basic coverage insurance carrier remains obligated to defend health care providers with respect to post-exhaustion claims.

Relevant to resolution of this dispute are subsections 702(d), (e) and (f) of the Act, 40 P.S. § § 1301.702(d),(e) and (f), (emphases added), which provide:

> (d) The *basic coverage insurance carrier* or self-insured provider *shall be responsible to provide a defense* to the claim, *including defense of the fund,* except as provided for in section 605 [not applicable here]. In such instances where the director has been notified in accordance with subsection (c), the director *may, at his option,*[6] join in the defense and be represented by counsel.

> (e) In the event that the basic coverage insurance carrier or self-insured provider enters into a settlement with the claimant to the full extent of *its* liability as provided

above, *it* may obtain a release from the claimant to the extent of *its* payment, which payment shall have no effect upon any excess claim against the fund or *its duty to continue the defense of the claim.*

> (f) The director is *authorized* to defend, litigate, settle or compromise any claim payable by the fund. A health care provider's basic insurance coverage carrier shall have the right to approve any settlement entered into by the director on behalf of its insured health care provider. . . . ·

Initially, we note that the CAT Fund was created under the Act for the express purpose of paying *awards, judgments and settlements for losses or damages,* as a consequence of professional liability claims brought against participating health care providers, that exceed the health care provider's basic coverage insurance. *See* 40 P.S. § 1301.701(d). The purpose statement found in subsection 701(d) of the Act makes no reference to the CAT Fund's defense of such claims. In fact, we agree with the CAT Fund that, where the payment of defense costs, as opposed to the payment of claim awards, is involved, subsection 702(d) of the Act clearly places the responsibility for such defense costs on the basic coverage insurance carrier or self-insured provider by providing that they *shall* be responsible to provide a defense to the claim, *including defense of the Fund.* 40 P.S. § 1301.702(d).[7] Further, the language in section 702(e) of the Act leaves no doubt that the basic coverage insurer

---

6. In 1996, the legislature amended this subsection and deleted the phrase "at his option." Although the 1996 deletion does not affect this case, we note that by retaining the word "may," the amended subsection 702(d) preserved the Director's discretion to decide whether to join in the defense of a claim.

7. As originally enacted, the first sentence of subsection 702(d) of the Act provided that "[t]he basic coverage insurance carrier shall at all times be responsible to provide a defense for the insured health care provider." Act of October 15, 1975, P.L.390 (amended 1976). The legislature altered this wording and added the phrase "including defense of the fund" when the Act was amended in 1976. The CAT Fund maintains that, in so doing, the legislature eliminated any ambiguity regarding the basic insurance carrier's defense obligation by clarifying that its obligation to defend extended not only to claims brought against the insured health care provider for

which the basic coverage carrier was liable, but also encompassed defense of the CAT Fund after the basic insurance carrier has paid out claims to the full extent of its liability.

Petitioners disagree with this reading of subsection 702(d). Contending that subsection 702(d) deals solely with the defense of claims within the basic coverage and has nothing to do with post-exhaustion claims, Petitioners reason that inclusion of the phrase "including defense of the fund" has no impact on the issue of who should defend health care providers for post-exhaustion claims. However, Petitioners dismiss the phrase "including defense of the fund" too easily. If, as they contend, subsection 702(d) has nothing to do with post-exhaustion claims, then this phrase serves no purpose here because, at the pre-exhaustion stage, the Fund requires no defense.

remains obligated to defend claims even beyond exhaustion of its coverage by providing that settlement up to basic coverage limits shall have no effect on the *duty of the basic coverage insurance carrier* (or self-insured provider) to continue the defense of the claim.[8]

Finally, we cannot ignore the wording of subsections 702(d) and 702(f) of the Act, both of which address the CAT Fund's role in connection with the defense of claims. Subsection 702(d) of the Act allows the Director, *at his option,* to join in the defense in cases where the Director has been notified in accordance with subsection 702(c) of the Act,[9] and subsection 702(f) of the Act *authorizes* the Director to defend claims payable by the Fund. In contrast to the mandatory language used to describe the defense responsibilities of the basic coverage insurer, the discretionary language of these subsections does not *obligate* the Director to defend claims payable by the CAT Fund but, rather, leaves it up to the Director to decide when, or if, it would be appropriate for the CAT Fund to defend such claims. In a proper exercise of this discretion, the Fund has elected not to assume responsibility for the defense of post-exhaustion claims. Neither Petitioners nor the court can interfere with the CAT Fund's statutorily granted discretion by substituting their judgment for that of the Director as to what is best for the financial integrity of the Fund.[10]  *See Popowsky v. Pennsylvania Public Utility Commission,* 669 A.2d 1029 (Pa.Cmwlth.1995), *reversed on other grounds,* 550 Pa. 449, 706 A.2d 1197 (1997).

Petitioners protest that the legislature could not have intended the CAT Fund's interpretation of the Act because that interpretation would frustrate, rather than advance, the Act's stated purpose of making professional malpractice insurance available to health care providers at a reasonable cost. Section 102 of the Act, 40 P.S. § 1301.102. Petitioners reason that, under the Fund's interpretation, health care providers would have to purchase insurance to cover the costs of defense for claims that their basic coverage carrier would not be indemnifying. According to Petitioners, such insurance may not be available in the marketplace and, even if available, the need to obtain such insurance would increase the cost of insurance for every health care provider by requiring them to purchase insurance which likely would

8. Petitioners contend that subsections 702(e) and 702(f) actually refute the CAT Fund's position. Petitioners point out that, in order to reach the interpretation that the Fund assigns to subsection 702(e), one must read the phrase *"its* duty to continue the defense of the claim" contrary to the rules of proper grammar. Petitioners note that, when read grammatically, "its" actually refers to "fund," rather than to "basic coverage insurance carrier." Although we agree with Petitioners that, read grammatically, subsection 702(e) clearly places the responsibility for continuing defense of the claim on the Fund, we point out that the legislature seems to have made this same grammatical mistake throughout the subsection. The pronoun "it" is used several other times in subsection 702(e), and each time, in contravention of the rules of grammar, the legislature clearly intended the pronoun to refer to the basic coverage carrier. Thus, when the legislature speaks of *"its* duty to continue defense of the claim," one can reasonably assume that the legislature once again intended to refer to the basic coverage carrier. In fact, when considered in conjunction with the other Act provisions, this is the only logical conclusion which can be reached.

9. Subsection 702(c) of the Act directs the basic coverage insurance carrier to promptly notify the Director in any case where the carrier reasonably believes that the value of the claim exceeds the basic insurer's coverage or falls under section 605 of the Act, 40 P.S. § 1301.605. Section 605, the only section of the Act requiring the CAT Fund to assume the cost of defense, provides that the CAT Fund *shall defend and pay* any claim made against a health care provider more than four years after the breach of contract or tort occurred but filed within the applicable statute of limitations.

10. With regard to subsection 702(f) of the Act, Petitioners argue that inherent in the *authority* to defend post-exhaustion claims is the assumption of post-exhaustion defense costs because it would be senseless to authorize the Fund to defend post-exhaustion claims while denying it the means to carry out such a defense. We see no merit in Petitioners' argument because, even assuming that the CAT Fund would have to pay post-exhaustion defense costs *if* the Fund opted to defend post-exhaustion claims, this does nothing to alter the discretionary language used by the legislature which allows the CAT Fund to choose not to defend claims payable by the Fund but, rather, to leave the defense of those claims to the basic coverage insurer. Here, for the reasons expressed in Bulletin 74, the CAT Fund has opted for the latter course of action.

prove unnecessary. By comparison, if the CAT Fund were responsible for the defense of post-exhaustion claims, payment of such defense costs would come from the Fund's reserves only if and when the need arose.[11]

■ We recognize that this court may disregard an agency's interpretation of an ambiguous statute when that interpretation directly contravenes the purpose underlying that statute. *Popowsky*. However, where the words of the applicable statute are clear and free of ambiguity, we are precluded from any further consideration of legislative intent. 1 Pa.C.S. § 1921(b); *King v. Boettcher*, 150 Pa.Cmwlth. 490, 616 A.2d 57 (1992), *aff'd*, 537 Pa. 574, 645 A.2d 219 (1994). Here the Act unambiguously obligates a basic coverage insurance carrier to defend professional liability claims, including defense of the Fund, and the Act just as clearly does not obligate the CAT Fund to defend these claims, even when they are payable by the Fund.[12] We may not disregard this clear statutory language in favor of an interpretation that, arguably, would better serve the purposes of the Act. Rather, in the event that the legislature desires to have the CAT Fund pay the costs of defending post-exhaustion claims, it has the power to expressly state that intention.[13]

Alternatively, Petitioners argue that, even if the Act provides the CAT Fund with the discretion not to defend health care providers' excess claims, the Fund should be estopped from refusing to assume defense

11. Annual and emergency surcharges levied on health care providers, along with any income realized by surcharge investment or reinvestment, provide the sole and exclusive source of funding for the CAT Fund. 40 P.S. § 1301.701(e)(1)–(4). Because the Fund's reserves, used to pay settlements and judgments, are obtained by assessing a surcharge on health care providers based on the CAT Fund's expenses and payments to medical malpractice claimants, health care providers ultimately would pay the cost of defense in any case. If the basic coverage insurer provided defense of post-exhaustion claims, providers would pay higher insurance premiums, and if the CAT Fund assumed the defense of such claims, health care providers might face higher surcharge assessments. However, it is logical that the cost to individual health care providers would be less if the Fund assumed responsibility for these defense costs because, in that case, the Fund would pay these costs only when needed, with replacement of monies expended shared by all health care providers.

12. Like Petitioners, we admit to being confused by the apparent conflict in the CAT Fund's position with respect to the Fund's defense obligations under the Act. On the one hand, the CAT Fund asserts that the Act does not permit the CAT Fund to assume the defense of post-exhaustion claims, and, on the other hand, the Fund maintains that the Act provides the Fund with the discretion to either defend or refuse to defend such claims. If the Act does not permit the Fund to pay for the costs of defense for post-exhaustion claims, then Bulletin 59 was in conflict with the Act and Bulletin 74 corrects the Fund's prior mistaken legal interpretation. If the Act leaves the decision of whether the Fund should defend post-exhaustion claims to the Director's discretion, then both Bulletin 59 and Bulletin 74 are consistent with the Act, but each reflects a different choice by the Director in the exercise of that discretion. In this event, Bulle-tin 74 merely indicates the Director's reconsideration of his prior policy choice and change of mind. We are satisfied that the Act does not expressly prohibit the CAT Fund from assuming the costs of defense for claims payable by the Fund but, rather, leaves that choice to the Director's discretion.

13. In this regard, we must address Petitioners' assertion that the courts and legislature have already dealt with the issue of the CAT Fund's responsibility to defend health care providers once their basic coverage is exhausted. Petitioners claim that the courts and legislature essentially decided this issue against the Fund by requiring the CAT Fund to pay delay damages and post-judgment interest applicable to the Fund's liability in a case, with the basic insurance carrier responsible only for its proportionate share of delay damages and post-judgment interest. *See* Section 702(j) of the Act, 40 P.S. § 1301.702(j); *Montgomery Hospital v. Medical Professional Liability Catastrophe Loss Fund*, 686 A.2d 432 (Pa.Cmwlth.1996); *Montgomery Hospital v. Medical Professional Liability Catastrophe Loss Fund*, 668 A.2d 221 (Pa.Cmwlth.1995); *King v. Boettcher*, 150 Pa.Cmwlth. 490, 616 A.2d 57 (1992), *aff'd*, 537 Pa. 574, 645 A.2d 219 (1994). Petitioners contend that there is no discernable distinction between payments of post-judgment interest and the costs at issue here because both are defense-related costs of a medical malpractice claim rather than part of the claim itself. Thus, Petitioners argue that where the legislature has mandated the CAT Fund to pay defense-related, post-judgment costs, the legislature must also have contemplated that the Fund assume other basic defense costs. However, because Petitioners mischaracterize post-judgment interest as a defense cost, rather than as a cost connected to the payment of the damage award itself, their argument is meritless.

costs because of the Fund's misleading statement in Bulletin 59. We disagree.

In order to establish estoppel against a government agency, one must prove: (1) misleading words, conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance upon the misrepresentation by the party asserting estoppel; and (3) the lack of a duty to inquire on the party asserting the estoppel. *Chester Extended Care Center v. Department of Public Welfare,* 526 Pa. 350, 586 A.2d 379 (1991). Contrary to Petitioners' contention, we do not believe that all three elements exist here.

Petitioners maintain that Bulletin 59 demonstrates that the CAT Fund was aware that the insurance industry was seeking clarification with respect to the defense of excess claims and that Bulletin 59 served as the Fund's acknowledgment that the Fund would assume the costs of such defense. Petitioners then argue that, because CCMC and other health care providers relied on the CAT Fund's statement in Bulletin 59, they entered contracts with their basic coverage carriers unaware that arrangements would have to be made for the defense of post-exhaustion claims. Similarly, Petitioners assert that Phico and other basic coverage carriers, in reliance on Bulletin 59, priced their insurance policies anticipating that their contractual obligations to their insureds would end upon exhaustion of policy limits. According to Petitioners, the CAT Fund's reversal of policy, which was particularly abrupt in this case, severely prejudiced these providers and their primary insurers by leaving them unprotected by and unprepared for a defense to post-exhaustion claims.

Although, in their brief in support of their motion for judgment on the pleadings, Petitioners claim that they, and others similarly situated, relied on Bulletin 59 when they entered their basic coverage insurance contracts, they never allege such reliance in their pleadings. Indeed, the issue specifically raised by Petitioners is whether the Fund is obligated to defend CCMC against professional liability claims that, due to the exhaustion of CCMC's basic coverage insurance with Phico for the policy year *July 1, 1991 through July 1, 1992,* are within the CAT Fund's indemnification obligation. Clearly, the 1991–92 policy was purchased before February 1992, when the CAT Fund issued Bulletin 59, and, thus, Petitioners could not have set policy terms and price in reliance on Bulletin 59. Absent proof of such reliance, Petitioners fail to establish all the elements necessary for estoppel.

Because the Act makes the defense of professional liability claims obligatory for the basic coverage insurance carrier and discretionary for the CAT Fund, the Director's decision not to defend claims payable by the Fund is entirely permissible under the Act and Petitioners are not entitled to the relief they requested in any of the three counts of their Petition for Review. Accordingly, we grant Respondents' motion for judgment on the pleadings and deny Petitioners' motion for judgment on the pleadings.

### ORDER

AND NOW, this 25th day of June, 1998, upon consideration of the Cross–Motions for Judgment on the Pleadings filed by Crozer Chester Medical Center and Phico Insurance Company (Petitioners), and by the Medical Professional Liability Catastrophe Loss Fund and its Director, John H. Reed (Respondents), Respondents' motion is hereby granted, and Petitioners' motion is hereby denied.