GENAEYA CORP.

v.

HARCO NATIONAL INSURANCE COMPANY, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 1, 2009.

Filed March 15, 2010.

Myles P. McAliney, Pittston, for appellant.

Ronnie J. Fischer, Honesdale, for appellee.

BEFORE: FORD ELLIOTT, P.J., PANELLA and FREEDBERG, JJ.

OPINION BY FORD ELLIOTT, P.J.:

¶ 1 Harco National Insurance Company ("Harco") appeals from the judgment entered July 7, 2008 in favor of Genaeya Corp. ("Genaeya") in this declaratory judgment action. After careful review, we are compelled to reverse.

¶ 2 The parties submitted this matter to the trial court for resolution based upon the following stipulated facts:

1. At all times relevant herein, [Genaeya] was a motor carrier authorized to transport property in interstate commerce pursuant to federal docket number MC472320.

2. At all times relevant herein, LAM Truck Brokers, Inc. (LAM) and BAM Transportation, Inc. (BAM) operated as freight brokers (collectively, LAM/BAM).

3. On or about July 22, 2005 Genaeya's driver, Janusz, was returning to Pennsylvania having just delivered a load in California.

4. On or about that same day, July 22, 2005, LAM/BAM contacted Genaeya inquiring about Genaeya transport-

ing a load for LAM/BAM to California.

5. Genaeya advised LAM/BAM that Genaeya's driver had just returned from California and needed the weekend off, since July 22, 2005 was a Friday.

6. Later on that same day, July 22, 2005, LAM/BAM once again contacted Genaeya to inquire about Genaeya delivering said load to a warehouse where LAM/BAM would have the load cross docked for delivery to the California destination.

7. At this time on July 22, 2005, LAM/BAM retained Genaeya, on behalf of Colgate–Palmolive Company, to transport said shipment of miscellaneous freight (the shipment) to Kearney, New Jersey.

8. Genaeya has alleged in a separate law suit filed in Wayne County, Pennsylvania [that] on or about July 22, 2005 LAM/BAM instructed Genaeya to transport the shipment from the facilities of Colgate–Palmolive Company in Morristown, New Jersey to World Trade Logistics in Kearney, New Jersey.

9. On or about July 22, 2005, Janusz on behalf of Genaeya transported the trailer said to contain the shipment to World Trade Logistics in Kearney, New Jersey, being directed to do so by LAM/BAM, so that LAM/BAM can have the load cross docked for delivery to the California destination.

10. On or about July 22, 2005, Janusz, on behalf of Genaeya, delivered the trailer to the location identified by LAM/BAM. When he arrived at the location, it was [a] partially fenced lot without a gate adjacent to a shipping facility operated by World Trade Logistics.

11. There was no one in charge of the lot area, neither a clerk dispatcher, security guard nor any representative of LAM/BAM. Janusz contacted LAM/BAM through his dispatcher and was advised to park the trailer against the wall of the World Trade Logistics building and leave the bill of lading on the front of the trailer. Janusz then unhooked the trailer from the tractor and left.

12. Genaeya notified LAM/BAM after the trailer was parked that the trailer was at the lot adjacent to the World Trade Logistics facility and that no one from LAM/BAM was there to accept the trailer.

13. LAM/BAM advised Genaeya that Saturday morning, July 23, 2005 said load would be cross docked and that the trailer would be empty for Genaeya to pick up on Monday.

14. On Tuesday morning, July 26, 2005, LAM/BAM contacted Genaeya and advised Genaeya that the cross dock of the load never occurred, and requested Genaeya to deliver the load to its California destination.

15. Genaeya agreed, for consideration, to transport the load from World Trade Logistics to California as directed by LAM/BAM.

16. On or about July 26, 2005, Janusz returned to the facility at World Trade Logistics with a tractor in order to transport the trailer to its final destination in California.

17. When Janusz arrived at the World Trade Logistics facility, the trailer and the shipment were missing.

18. At all times relevant herein, [Harco] was an insurance carrier duly authorized to issue motor truck

cargo liability policies in the Commonwealth of Pennsylvania.

19. Harco issued motor truck cargo liability policy number MC3038106 to Genaeya with effective dates of November 20, 2004 to November 20, 2005. A true and correct copy of the Harco policy is attached hereto and made a part hereof and labeled Exhibit A.

20. The Harco policy was in full force and effect at the date of the loss.

21. On or about July 28, 2005, Harco was advised by or on behalf of Genaeya of a potential claim involving a loss.

22. Thereafter Genaeya commenced an action against LAM/BAM in Wayne County, bearing docket number 590–Civil–2005, seeking to recover freight charges allegedly due Genaeya by reason of the transportation performed with respect to this shipment and other shipments. See copy of Complaint of Genaeya attached hereto and marked Exhibit B.

23. On or about December 14, 2005, LAM/BAM filed a Counterclaim against Genaeya seeking to recover an [sic] excess of $48,000.00, representing the alleged value of the shipment. See copy of Counterclaim of LAM/BAM attached hereto and marked Exhibit C.

24. On or about March 15, 2006 Genaeya tendered the Cargo Counterclaim to Harco for defense.

25. On or about April 26, 2006 Harco advised Genaeya that it was declining to defend Genaeya on the Cargo Counterclaim or to indemnify Genaeya for its liability, if any, arising out of the loss.

26. On or about February 16, 2007 Genaeya commenced the instant action against Harco seeking a declaration that Harco is obligated to defend Genaeya in the Cargo Counterclaim, and to indemnify Genaeya for its liability, if any, arising out of the loss.

"Stipulated Facts," 2/13/08 at 1–5; Docket No. 14.

¶ 3 On February 25, 2008, the trial court found that Harco is obligated to defend and indemnify Genaeya in the underlying lawsuit up to the limits of the policy. The trial court determined that the language used in the policy regarding Harco's duty to defend was vague and ambiguous and, therefore, must be construed in favor of the insured. (Opinion and order, 2/25/08 at 1.) Post-trial motions were denied on May 7, 2008, and notice of appeal was filed on June 4, 2008.[1] On June 5, 2008, appellant Harco was ordered to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal within 21 days; Harco timely complied on June 25, 2008. (Docket No. 33.) On August 4, 2008, the trial court filed a Rule 1925(a) statement of reasons, relying on its prior opinion and order of February 25, 2008.

---

[1.] Harco purported to appeal from the May 7, 2008 order denying post-trial motions. Appeal does not properly lie from an order denying post-trial motions, but rather upon judgment entered following disposition of post-trial motions. *Brown v. Philadelphia College of Osteopathic Medicine*, 760 A.2d 863, 865 n. 1 (Pa.Super.2000), *appeal denied*, 566 Pa. 632, 781 A.2d 137 (2001), citing *Johnston the Florist v. TEDCO Const.*, 441 Pa.Super. 281, 657 A.2d 511, 514 (1995). Following notice from this court, Harco filed a praecipe to enter judgment on July 7, 2008. A certified copy of the trial court docket reflects that judgment was entered on that date. Pursuant to Pa. R.A.P. 905(a)(5), the notice of appeal previously filed in this case will be treated as filed after the entry of judgment.

¶ 4 Harco has raised the following issues for this court's review:

I. Is a policy of cargo insurance which contains language which purports to reserve to the insurer an election to defend the insured against suits arising from claims made by owners of property lost vague, giving rise to a duty to defend the insured in a suit brought against it for loss of that property?

II. Does an insurer owe indemnity and insurance to its insured when the facts alleged in the underlying action and the facts stipulated to at trial do not bring the claims within the coverage afforded by the policy of insurance?

Harco's brief at 4.

¶ 5 "The proper construction of a policy of insurance is resolved as a matter of law in a declaratory judgment action." *Alexander v. CNA Insurance Co.*, 441 Pa.Super. 507, 657 A.2d 1282, 1284 (1995), *appeal denied*, 543 Pa. 689, 670 A.2d 139 (1995) (citation omitted). "The Declaratory Judgments Act may be invoked to interpret the obligations of the parties under an insurance contract, including the question of whether an insurer has a duty to defend and/or a duty to indemnify a party making a claim under the policy." *General Accident Ins. Co. of America v. Allen*, 547 Pa. 693, 706, 692 A.2d 1089, 1095 (1997) (citations omitted). Both the duty to defend and the duty to indemnify may be resolved in a declaratory judgment action. *Id.* at 707, 692 A.2d at 1096, citing *Harleysville Mutual Ins. Co. v. Madison*, 415 Pa.Super. 361, 609 A.2d 564 (1992) (insurer can seek determination of obligations to insured before conclusion of underlying action) (additional citations omitted).

¶ 6 As stated above, the parties submitted this matter to the trial court on stipulated facts and the question of whether or not Harco has a duty to defend and/or indemnify its insured, Genaeya, is a question of law. Accordingly, our standard of review is *de novo* and our scope of review is plenary. *Buffalo Tp. v. Jones*, 571 Pa. 637, 648 n. 8, 813 A.2d 659, 666 n. 8 (2002) (citation omitted).

¶ 7 The Harco policy provides that *"We may elect to defend you* against suits arising from claims of owners of property. We will do this at our expense." (Emphasis added.) Harco contends that this language clearly and unambiguously conveys that it has the right, rather than the duty, to defend Genaeya against such lawsuits. In other words, it is discretionary with the insurer. The trial court disagreed, finding that this terminology, "may elect to defend," is vague and ambiguous, and must be construed against Harco.

'Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.' *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983). 'Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.' *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 512 Pa. 420, 517 A.2d 910, 913 (1986).

*Prudential Property and Casualty Ins. Co. v. Sartno*, 588 Pa. 205, 212, 903 A.2d 1170, 1174 (2006).

Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' *Hutchison v. Sunbeam Coal Co. [Corp.]*, 513 Pa. 192, 201, 519 A.2d 385, 390 (1986). This is not a question to be resolved in a vacuum. Rather, contrac-

tual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.

*Id.,* quoting *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999).

Words of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions. Moreover, courts must construe the terms of an insurance policy as written and may not modify the plain meaning of the words under the guise of 'interpreting' the policy. If the terms of a policy are clear, this Court cannot re-write it or give it a construction in conflict with the accepted and plain meaning of the language used.

*Wall Rose Mutual Ins. Co. v. Manross,* 939 A.2d 958, 962 (Pa.Super.2007), *appeal denied,* 596 Pa. 747, 946 A.2d 688 (2008) (citation omitted).

¶ 8 "[I]t has been held that an insurer has no duty to defend if the contract of insurance does not include a duty to defend clause[.]" *Alexander, supra* at 1284 n. 2, citing *Widener University v. Fred S. James & Co., Inc.,* 371 Pa.Super. 79, 537 A.2d 829 (1988). "It is hornbook law that '[t]he duty of a general liability insurer to provide a defense for claims asserted against its insureds is contractual, and the courts will therefore look to the language of the policy at issue to determine an insurer's defense obligations.'" *Henkel Corp. v. Hartford Accident & Indemnity Co., et al.,* 399 F.Supp.2d 607, 613 (E.D.Pa. 2005), *affirmed,* 271 Fed.Appx. 161 (3rd Cir.(Pa.) 2008), quoting 1 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 5.01 (12th ed.2004). Pennsylvania adheres to this policy. *Id.,* citing *State Farm v. Coviello,*

233 F.3d 710, 717 (3rd Cir.2000) ("Under Pennsylvania law, the court is 'not at liberty to rewrite an insurance contract, or to construe clear and unambiguous language to mean something other than what it says.'") (additional citations omitted). "Equally true ... is the hornbook principle that in contract disputes, the plain language of the agreement is the best evidence of the parties' intent." *Id.* (citations omitted). Therefore, an insurer's duty to defend is purely contractual, and an insurer has no duty to defend unless the obligation is expressed in the policy. 1 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 5.01[a] (14th ed.2008).

¶ 9 We agree with Harco that the phrase "may elect to defend" is not ambiguous and clearly conveys that Harco retains the discretion whether or not to defend Genaeya against any potential lawsuit. While it appears that there is no Pennsylvania case law considering a similarly worded clause, and the parties have cited to none, there are cases from other jurisdictions which prove instructive. In *Ohio Casualty Ins. Co. v. Carman Cartage Co., Inc.,* 262 Neb. 930, 636 N.W.2d 862 (2001), the Supreme Court of Nebraska found no duty to defend where the policy provided that:

In the event of 'loss' involving property of others in your care, custody or control, *we have the right to:* 2. Provide a defense for legal proceedings brought against you. *If provided,* the expense of this defense will be at our cost and will not reduce the applicable Limits of Insurance Under this insurance.

*Id.* at 866 (emphasis added). The Nebraska court held that this language clearly and unambiguously gave Ohio Casualty a *right* to defend claims against its insured, but imposed no *duty* to defend. *Id.* at 866–867, citing, *inter alia, B & D Appraisals v. Gaudette Machinery Movers,* 752

F.Supp. 554, 556 (D.R.I.1990) (where the policy provided that "this Company reserves the right at its sole option to defend such action," the unambiguous language of the policy gave the insurer only the right to exclusive control over potential litigation, and not the duty to defend); *City of Peoria v. Underwriter's at Lloyd's London, Uninc.*, 290 F.Supp. 890, 892 (S.D.Ill. 1968) (policy which provided that the insurer "may, 'if they so desire,' 'take over the conduct ... of the defense of any claim' covered by the policy provisions" created only the right, not the obligation, to assume conduct of the defense).

¶ 10 An appellate court in Florida examined identical language as that in *Carman Cartage, supra,* and also held that the contract terms relieved the insurer of any duty to defend:

> A state court in Nebraska and a federal court in Illinois addressed the exact same insurance provision at issue. Both courts were in agreement that where policy language creates a *right* to defend, it is clear and unambiguous that it does not create a *duty* on the part of the insurer.

*East Florida Hauling, Inc. v. Lexington Ins. Co.*, 913 So.2d 673, 678 (Fla.App. 3 Dist.2005), *review denied,* 931 So.2d 899 (Fla.2006), citing *Centennial Ins. Co. v. Transitall Servs., Inc.*, 2001 WL 289879 (N.D.Ill.2001); *Carman Cartage, supra* (emphasis in original). "The court in *Centennial* held that, even when the complaint in the underlying lawsuit alleges facts within the coverage of the policy, if the policy confers on the insurer only a *right* to defend, the insurer is not obligated to defend the insured." *Id.,* citing *Centennial, supra* at *3 (emphasis in *East Florida Hauling* ).

¶ 11 Here, the relevant policy language states that Harco "may elect" to defend its insured, Genaeya, against potential claims from property owners. Since this language creates only a *right* to defend, it clearly and unambiguously does not create a *duty* on the part of Harco. *East Florida Hauling, supra.* As Harco states in its brief on appeal, the provision is ambiguous only in the sense that it leaves the decision up to Harco whether or not to undertake a defense on Genaeya's behalf. (Harco's brief at 15–16.) It very clearly does not create any mandatory *duty* to defend, or grant any right to Genaeya.

¶ 12 In *Crozer Chester Medical Center v. Medical Professional Liability Catastrophe Loss Fund,* 713 A.2d 1196 (Pa.Cmwlth. 1998), *affirmed,* 555 Pa. 558, 725 A.2d 755 (1999), the Commonwealth Court examined similar language in the context of the Health Care Services Malpractice Act.[2] Sections 702(d) and (f) of the Act provided, in relevant part, that the director of the CAT Fund "may, at his option," join in the defense of professional liability claims and be represented by counsel, and that the director "is authorized" to defend any claim payable by the Fund. *Id.* at 1199, quoting 40 P.S. §§ 1301.702(d), (f). The Commonwealth Court held that this statutory language granted to the director the discretion to decide whether to join in the defense of a claim:

> Finally, we cannot ignore the wording of subsections 702(d) and 702(f) of the Act, both of which address the CAT Fund's role in connection with the defense of claims. Subsection 702(d) of the Act allows the Director, *at his option,* to join in the defense in cases where the Director has been notified in accordance

---

2. The Health Care Services Malpractice Act was repealed in 2002 and replaced by the Medical Care Availability and Reduction of Error (MCARE) Act, 40 P.S. §§ 1303.713, 1303.714.

with subsection 702(c) of the Act, and subsection 702(f) of the Act *authorizes* the Director to defend claims payable by the Fund. In contrast to the mandatory language used to describe the defense responsibilities of the basic coverage insurer, the discretionary language of these subsections does not *obligate* the Director to defend claims payable by the CAT Fund but, rather, leaves it up to the Director to decide when, or if, it would be appropriate for the CAT Fund to defend such claims.

*Id.* at 1200 (emphasis in original) (footnote omitted). The *Crozer* court also noted that in 1996, the legislature deleted the phrase "at his option"; however, it would not change the result since by retaining the word "may," the amended subsection 702(d) preserved the director's discretion to decide whether to join in the defense of a claim. *Id.* at 1199 n. 6.

¶ 13 While *Crozer*, as a Commonwealth Court case interpreting statutory language relating to the administration of the CAT Fund, is obviously not controlling as to the issue *sub judice*, we agree that the word "may" clearly connotes a discretionary, rather than a mandatory, obligation. The addition of the word "elect," *i.e.*, "may elect to defend," further underscores that the decision rests with the insurer. The Random House Dictionary of the English Language defines "elect" as "to pick out; choose," or "to choose or select someone or something." Roget's Thesaurus, Fourth Edition, includes "choose" as a synonym for the verb form of the word "elect." The policy gives Harco the right to choose whether to defend a claim. We determine that the clear and unambiguous policy language created a *right* to defend, and did not create a *duty* on the part of the insurer, Harco. Therefore, the trial court erred as a matter of law in finding that Harco owed Genaeya a duty to defend the underlying lawsuit.

¶ 14 We now turn to Harco's second issue on appeal, that the trial court erred in finding a duty to indemnify should LAM/BAM prevail against Genaeya in the underlying lawsuit. We agree with Harco that the facts, as stipulated, do not bring the claim within the scope of coverage.

Preliminarily, we note that '[t]he interpretation of an insurance contract regarding the existence or non-existence of coverage is "generally performed by the court." ' *Minnesota Fire and Cas. Co. v. Greenfield*, 579 Pa. 333, 344, 855 A.2d 854, 861 (2004). 'The interpretation of an insurance contract is a question of law, our standard of review is *de novo*, thus, we need not defer to the findings of the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary.' *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 331, 908 A.2d 888, 893 (2006).

*Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 154–155, 938 A.2d 286, 290 (2007). The duty to defend is separate from the duty to indemnify. *Allen, supra* at 706, 692 A.2d at 1095.

¶ 15 Under Section II, "Cargo Coverage," the policy provides that "We will pay all sums you legally must pay for 'loss' to 'cargo' while it is in your custody and in or on a covered 'auto.' " According to the stipulated facts, Genaeya's driver unhitched the trailer containing the cargo from the tractor and left it in the lot as instructed by LAM/BAM. Therefore, the cargo was no longer in Genaeya's custody when it was stolen.

¶ 16 Under Section I, "Covered Property," the policy provides that "the following will also be considered covered 'autos': 2. Any trailer you own, lease, hire or borrow while it is being used in your business

provided it is attached to a covered 'auto[.]' " As Harco observes, "Under this portion of the policy an unattached trailer is not covered unless it is attached to a covered auto. Even the stipulated facts agree that the trailer was left unattended by its driver." (Harco's brief at 18.) According to the stipulated facts, the driver, Janusz, "unhooked the trailer from the tractor and left." ("Stipulated Facts," 2/13/08 ¶ 11.)

¶ 17 Finally, the policy provides that

A trailer you own, lease, hire or borrow will also be a covered 'auto' while it is being used by you to transport 'cargo' provided: 1. It is in a garage, terminal, or depot for a period not exceeding seventy-two (72) hours; or 2. It is unattached, as the result of an accident or breakdown, for a period not exceeding twenty-four (24) hours while awaiting either repair or transfer of the 'cargo' to another trailer.

Instantly, the trailer was not unattached as the result of an accident or breakdown; therefore, subsection two does not apply. Genaeya argues that subsection one applies because the trailer was left in a "garage, terminal, or depot."

¶ 18 Random House defines "garage" as "a building or place for sheltering, cleaning, or repairing motor vehicles." "Terminal" is defined as "a major assemblage of station, yard, maintenance, and repair facilities, as at a terminus, at which trains originate or terminate, or at which they are distributed or combined." A "depot" is "a place to which supplies and materials are shipped and stored for distribution" or "a storehouse or warehouse, as a building where freight is deposited."

¶ 19 According to the stipulated facts, Janusz, at the direction of LAM/BAM, left the trailer in a "partially fenced lot without a gate adjacent to a shipping facility operated by World Trade Logistics."

(Stipulated Facts, 2/13/08 ¶ 10.) For purposes of coverage, it is clear that the trailer was not left at the World Trade Logistics facility, but rather in an unsecured lot adjacent to it, and that no one was there from LAM/BAM to accept the cargo. (*Id.* ¶ 12.) There was no one in charge of the lot area and no security guard or representative of LAM/BAM was present. (*Id.* ¶ 11.) This was clearly not a "garage, terminal or depot" as those terms are commonly used and understood. It was a partially fenced-in lot adjacent to, but not inside, the shipping facility. As Harco states, even under the facts alleged in LAM/BAM's counterclaim, the lot cannot be considered a garage, terminal or depot. LAM/BAM alleged that Genaeya's driver failed to deliver the cargo to the secured yard of World Trade Logistics, and instead left the trailer in an unsecured location across from the local post office. (LAM/BAM's counterclaim ¶¶ 6, 7.) LAM/BAM alleged that the property where Janusz left the trailer was not owned, secured, or operated by either World Trade Logistics or Colgate–Palmolive. (*Id.* ¶¶ 8, 9.) Therefore, even if we go beyond the stipulated facts and examine the allegations in the underlying complaint, Genaeya's loss is not within the scope of coverage provided in the Harco policy.

¶ 20 At any rate, for cargo coverage to apply, the cargo must not only be in or on a "covered auto" but also in Genaeya's custody. As explained *supra*, the cargo left Genaeya's custody when its driver unhitched the trailer and left. The trial court erred in finding a duty to indemnify Genaeya in the event LAM/BAM is successful on its counterclaim.

¶ 21 Having found that Harco has no duty to defend/indemnify its insured, Genaeya, we will reverse the order below.

¶ 22 Order reversed. Jurisdiction relinquished.